[No. 26936. *En Banc.* April 5, 1939.]

INVESTMENT AND SECURITIES COMPANY, *Appellant,* v.
THE AMERICAN BANK OF SPOKANE,
*et al., Respondents.*[1]

[1]Reported in 88 P. (2d) 852.

*Witherspoon, Witherspoon & Kelley,* for appellant.

*Robertson & Smith* and *Hart Snyder,* for respondents.

STEINERT, J.—This action was brought to establish a claim against the assets of an insolvent bank. Defendants' motion for nonsuit at the conclusion of plaintiff's evidence was granted. From the judgment dismissing the action, plaintiff has appealed.

The facts giving rise to the present controversy proceed from an ominous background: On January 23, 1929, a financial crisis faced the city of Spokane. The Exchange National Bank, one of the oldest and largest financial institutions in that community, had failed a few days before, and a run on the City National Bank of Spokane had begun. As a consequence, there was much uneasiness in the city, and a grave apprehension arose lest the run on the City National would spread to other banks and precipitate a financial disaster.

The national banking authorities, realizing the effect that a failure of the City National would have upon the other national banks of Spokane, were insisting that

something be done at once to keep the City National liquid. Accordingly, a meeting of the representatives of the local clearing house banks was hurriedly called and held on the night of January 23rd. The purpose of the meeting was to evolve some plan of protecting the financial structure of the city by stopping the run on the City National and preventing consequent runs on the other banks.

It was the opinion of those attending the meeting that the only way of accomplishing the desired result was to have some strong bank in Spokane take over the City National that very night and start paying off its depositors the following morning. Their first endeavor, therefore, was to get one of the banks of the city to agree to assume the responsibility of taking over the affairs of the City National immediately, move its headquarters to the premises of such sponsor, and liquidate its assets to the best advantage of the depositors. The benefits of such an arrangement were fully recognized and formed the very basis of the conference. However, the situation presented a delicate and difficult task. There was little time for protracted legal parley or for meticulous detail concerning the possible methods of reimbursing the sponsoring bank according to strict and technical rules of law. Of necessity, the clearing house banks and their legal representatives, working to a common end, were pressed to formulate, in the shortest time possible, a written agreement as broad, in terms, as the emergency demanded.

As a result of the conference, carried on during the night, The Old National Bank & Union Trust Co. was induced to undertake the liquidation of the City National, according to the proposed plan, and a written agreement was thereupon prepared and signed by five member banks of the clearing house, including The Old National and the American Bank of Spokane, the

parties immediately concerned in this action. The agreement read as follows:

"A run having begun today on the City National Bank of Spokane, and it appearing that it is necessary that its business should be taken over and its liabilities assumed by some bank in Spokane, and The Old National Bank and Union Trust Co. having agreed to take over the business of such bank and assume its liabilities on condition that it is indemnified against loss in so doing to the extent hereinafter indicated,

"Now, therefore, the undersigned banks doing business in Spokane in consideration of the benefits accruing and to accrue from preventing the failure of the City National Bank, agree with one another and with The Old National Bank and Union Trust Co. above named that each of them will contribute its pro rata share of whatever loss (if any) the said purchasing bank shall sustain by reason of taking over the business and assuming the liabilities of the City National Bank.

"The pro rata share of each signer shall be determined by the proportion which its capital stock and surplus as shown by the call of December 31, 1928, bears to the capital stock and surplus of each other signer as shown by such call.

"The above named purchaser of the business of the City National Bank shall bear its proportion as above determined of any loss. The proportion of loss of each signer shall be paid within thirty days after the ascertainment of the loss sustained and notice thereof to it."

Pursuant to this agreement, the Old National took over, for administration, the affairs of the City National, and the pending crisis was, at least temporarily, relieved.

We come now to the progress of events, stated chronologically, occurring after the execution of the written agreement.

The Old National administered the affairs of the City National under the terms of the agreement until March 19, 1929, at which time the City National, by

formal resolution, placed itself in voluntary liquidation, under the provisions of United States Revised Statutes, §§ 5520, 5521 [12 U. S. C. A., §§ 181, 182]. Pursuant thereto, the Old National was appointed liquidating agent of the City National in accordance with the law, and functioned as such until December 5, 1930. The liabilities of the City National, determined as of January 23, 1929, when the Old National took over its affairs, amounted to $2,777,875.03, which the Old National assumed. The total net cash realization to the Old National between January 23, 1929, and December 5, 1930, amounted to $2,527,339.70, leaving a balance of $250,536.33 then owing to the Old National.

On December 5, 1930, a receiver for the City National was appointed by the United States comptroller of currency, whereupon the Old National transferred to the receiver all the remaining assets of the City National. At the same time, the Old National filed with the receiver its claim of loss in the specific sum of $250,536.33. This was done with full knowledge on the part of respondent American Bank of Spokane. The receiver issued a certificate of proof of claim on March 25, 1931, certifying therein that the Old National or its assignee was alone entitled to dividends on the claim. Between March 25, 1931, and April 15, 1932, payments on the claim were periodically made by the receiver.

On April 15, 1932, respondent American Bank of Spokane, one of the parties to the written agreement, was taken over by the state supervisor of banking. The supervisor published notice to creditors on April 30, 1932. The time for filing claims against the American expired July 29, 1932.

On July 11, 1932, which was within the time prescribed, the Old National filed with the supervisor its claim against the American in the sum of $5,501.78,

which was the pro rata share of the American in the amount then owing the Old National upon its claim originally filed with the receiver of the City National. On August 19, 1932, the supervisor advised the Old National, by letter, that its claim would be held in abeyance until all the assets of the City National had been liquidated and the amount of loss by the Old National had been finally determined.

Between July 11, 1932, and December 23, 1936, further dividends were paid by the receiver of the City National to the Old National, thereby reducing the claim of the latter to $107,061, and the pro rata share of the American therein to $3,918.43.

On January 11, 1937, the supervisor for the first time rejected the claim of the Old National against the American. Shortly thereafter, the Old National assigned its claim to appellant, Investment and Securities Co., by whom this action was brought April 7, 1937, at which time the affairs of the American were still in process of liquidation and settlement.

The sole reason for the rejection by the supervisor of the Old National's claim against the American and for the subsequent dismissal of the present action by the court was that on July 29, 1932, which was the last day of the statutory period for filing claims against the American, the amount of loss sustained by the Old National in the liquidation of the City National had not been definitely ascertained, and that, therefore, no claim could either then or thereafter be filed by the Old National against the American.

In considering the reason so advanced, these facts should be kept in mind: (1) The Old National was not a compensated surety; (2) the five contracting banks, including the American, were mutually interested in perfecting and consummating the plan for liquidating the City National; (3) the Old National

performed its agreement to the letter, so long as it was permitted to remain in charge of the assets of the City National; (4) by proceedings over which it had no control, the administration of the City National was taken out of the hands of the Old National by the United States comptroller of currency; (5) the loss which the Old National had incurred at the time that the City National went into the hands of a receiver was the definite sum of $250,536.33; (6) the Old National immediately filed its claim in that amount with the receiver of the City National, and its claim was allowed in full; (7) upon the claim so recognized, dividends were regularly paid; (8) when the American was later taken over by the state supervisor, the Old National promptly, and within the statutory period, filed its claim, in a definite sum, for the proportionate part of the loss which the American had agreed to pay; (9) the Old National did everything humanly and legally possible for it to do toward perfecting its claim against the American; and, finally, (10) the affairs of the American were at all times herein mentioned still in process of liquidation and settlement.

■ Preliminary to a consideration of the main question in the case, there arises the question as to the purpose of the original agreement between the five contracting banks. In determining that question, we apply the rule applicable to contracts generally, namely, that the purpose is to be ascertained by the intention of the parties. *National Surety Co. v. Campbell*, 108 Wash. 596, 185 Pac. 602; *National Bank of Tacoma v. Aetna Casualty & Surety Co.*, 161 Wash. 239, 296 Pac. 831.

When the contract is read and considered in the light of the circumstances surrounding it, as detailed above, we think it becomes apparent that the contract was

not simply one to indemnify the Old National, considered as an independent surety, but rather, an undertaking by which all the contracting parties thereto, including the Old National, agreed among themselves jointly to assume the entire loss resulting from the liquidation of the City National, each to "contribute its pro rata share" of such loss. The Old National was merely the medium through which all the banks intended and assumed to act in the emergency presented. Whatever loss should be entailed in the liquidation, as subsequently shown by the books to be kept by the Old National, was not to be solely its loss, for which it could only seek indemnity, but was, rather, the direct loss of all, measured by the proportionate capital stock and surplus of each. In brief, the contract of the subscribing parties was not simply an agreement to indemnify one of them for its ultimate personal and individual loss, but was an agreement expressing present liability of the several parties to pay their proportionate parts of the loss incident to the liquidation which all had agreed upon and instigated.

We come now to the crucial question in the case, which is: Was the claim of the Old National against the American, at the time of its filing, an actionable claim or, at least, a certain but unmatured claim, or was it, on the contrary, merely contingent, as those respective terms are defined and understood in insolvency proceedings?

In *Berkheimer Mfg. Co. v. American Wood Pipe Co.*, 178 Wash. 98, 34 P. (2d) 351, wherein was involved a claim against the assets and estate of an insolvent corporation in the hands of a receiver, a formula for the classification and determination of the provability of claims was prescribed as: (1) Those claims which, at the commencement of the proceed-

ings, furnish a present cause of action; (2) those which, at the commencement of the proceedings, are certain but are not matured, or, in other words, are unliquidated; and (3) those which are contingent. Claims of the first and second classes were designated as being provable; claims of the third class were designated as not being provable.

Inasmuch as the *Berkheimer* case was, by the trial court, and is, by counsel herein, regarded as determinative of the present issue, we shall consider and analyze that case in some detail.

The American Wood Pipe Company having become insolvent, a receiver was appointed on April 18, 1929, to take possession of, and liquidate, its assets for the benefit of its creditors. The receiver published notice to creditors requiring that all claims be served and filed on or before July 27, 1929. Between the date last mentioned and February 23, 1932, the receiver filed two reports setting forth a list of the claims filed, the payment of preferred claims and expenses of administration, and the amount on hand available for distribution. After a hearing on the second report, the court ordered that the accrued expenses be paid, that the remainder of the funds be distributed among the general creditors, and that the receivership be continued for the purpose of collecting an outstanding claim which the receiver held against another company in the sum of twenty thousand dollars. Thereafter, on January 9, 1933, which was nearly three and one-half years after the time for filing claims against the receiver had expired, Aetna Casualty & Surety Company, the appellant in that case, filed a claim in the sum of over one hundred thousand dollars. That claim was based upon several judgments rendered about December 8, 1932, against the Aetna upon its surety bonds executed at the instance of

American Wood Pipe Company in favor of various firms, including a bank in Tacoma. It appeared, however, that the Aetna had contested its liability on the bonds and had refused to make payment thereon until judgment was obtained against it by the Tacoma bank. The Aetna's subsequent claim against the re-. ceiver, based on the judgment which it had incurred, was disallowed by the court, and, upon appeal, the order of disallowance was affirmed.

The opinion in that case, after stating the formula above given for the classification and determination of provability of claims, held that the Aetna's claim was a wholly contingent one until December 8, 1932, which was nearly three and a half years after the time for filing claims had expired. The reason given for that conclusion was that the Aetna had not paid or even recognized the bank's claim as a liability against it during the period for filing claims in the insolvency proceedings, but had paid the claim only after protracted litigation which was consummated long after the period of notice had expired. Speaking of the nature of the Aetna's claim, we said:

"It was contingent upon an assertion of claim by the bank against appellant and the *payment* of that claim by appellant, or else, at least, upon an admission or a recognition by appellant that it was a valid, though unliquidated, claim. Until those two contingencies, or at least one of them, occurred, appellant had no claim whatever. Until then, there was nothing except a contingency upon which appellant could rest a claim."

The case at bar is quite different from the *Berkheimer* case in point of fact, and, because of that difference, we are of the opinion that the claim herein comes under the class of provable claims within the formula and definitions set forth in that very case.

The Old National's claim falls within the first class

designated in the *Berkheimer* case, namely, claims which, at the commencement of the proceeding, furnish a present cause of action; for, even if the written agreement between the contracting banks be considered as a contract for indemnity against loss, rather than one against liability, the loss sustained by the Old National was definitely fixed on December 5, 1930, when it was required to surrender all the assets of the City National to the receiver, and it then had the right to look to the contracting members, including the American, for contribution proportionately. Certainly, when on July 11, 1932, the Old National filed its claim against the supervisor in the definite sum of $5,501.78, the claim was in form and substance sufficient to support a present cause of action.

The mere fact that there might have been, and ultimately was, some salvage in the remaining assets of the City National held by the receiver did not alter the fact of definite loss by the Old National, nor did it affect the validity or integrity of its claims against the City National. When the affairs of the City National were taken out of the hands of the Old National and placed exclusively under the supervision of the receiver, the Old National lost all control over any possible salvage and was deprived of all opportunity of reducing its loss through the disposition of any assets previously held by it. In law, the salvage belonged, not to the Old National, but to the receiver, and the returns therefrom were paid by the receiver simply as dividends on the various existing claims. When the American went into liquidation, the amount of loss sustained by the Old National was no less definite and certain although, in the meantime, the original amount had been further reduced by the receipt of certain dividends. Had the claim of the Old

National against the American been paid, the American would then have been entitled to its proportionate share of any further dividends coming from the receiver of the City National. In our opinion, the claim of the Old National against the American furnished the basis of an immediate cause of action, and was, therefore, a provable claim.

█ There is another ground upon which the provability of the claim of the Old National against the American may properly and safely be rested. It is found in the equity side of the court. Approaching the matter from that point of view, we have these ultimate facts, which cannot be disputed: (1) The Old National incurred a definite loss by its faithful performance of the contract with the other banks; (2) it did everything that it could legally or practically do, or be expected to do, in order to perfect its claim against the American; (3) the supervisor accepted and recognized the claim and positively indicated that it would be held in abeyance, thus preserving its viability during the period of time required to determine its exact amount; and (4) the affairs of the American are still in process of liquidation, and an expeditious settlement and distribution of its estate have nowise been impeded by the intromission of the Old National's claim.

The only reason advanced for the subsequent disallowance of the claim is a supposed arbitrary barrier, set by the statute, against the filing of claims after the ninety-day period, and an asserted contention that the claim had not fully matured within that time. Thus it will eventuate that, if the respondent prevails, a just claim, expeditiously presented by the claimant, duly acknowledged by the supervisor, and possessing every element of certainty that human effort could supply, will have been rejected by mere fiat impossible

of performance. Within this field of jurisprudence, and upon such set of facts, equity is not impotent.

By Art. IV, § 6, of the Washington constitution the superior court has original jurisdiction in all cases in equity, and, among other things, of proceedings in insolvency. In the case of *In re Cashmere State Bank,* 169 Wash. 258, 13 P. (2d) 892, we held that, although the supervisor of banking was a statutory receiver and that his duties were to be discharged according to the procedure prescribed by the banking act, nevertheless, in all matters of vital concern, the court retained full jurisdiction because the assets of the bank were to be considered as being *in custodia legis.*

In the *Berkheimer* case, to which extended reference has already been made, it was recognized that the circumstances of a particular case might be of such extraordinary and appealing nature that a court of equity might well exercise its discretion to extend the time for filing certain claims. Were the supervisor in this case a receiver appointed by the court, we have no doubt whatever that the circumstances narrated would have justified the court in actually extending the time to permit the Old National to file a claim in the amount finally due it. But it is not necessary to go even that far in the instant case. While it may be conceded that the supervisor would not have the power to permit claims to be filed, for the first time, after the statutory period of ninety days had run, the fact here is that the claim actually was filed within that time. The court is asked to do no more than what the supervisor indicated he would do, namely, to hold a claim, duly filed, in abeyance until the exact amount due thereunder could be ascertained. This, certainly, is not beyond the power of equity to do, and the facts and circumstances are the most compelling argument why it

456

should be done. To do less would, in our opinion, be an unconscionable act. To grant the relief requested will legally hurt no one, and a just claim will have been protected.

The judgment is reversed, with instructions to the court to proceed in accordance with the views herein expressed.

BEALS, ROBINSON, GERAGHTY, and JEFFERS, JJ., concur.

MAIN, J. (dissenting)—It will be observed that the agreement set out in the majority opinion, which was signed by the member banks of the clearing house, repeatedly uses the word "loss," and nowhere uses the word "liability." It seems to me that the instrument is too plain for construction. The obvious intent of the signers was to indemnify against loss, and not against liability.

As to the character of the claim, it appears to me that it was, undoubtedly, a contingent one, and the amount of the loss was not ascertained until subsequent to the time when claims under the law could be presented.

In *Berkheimer Mfg. Co. v. American Wood Pipe Co.*, 178 Wash. 98, 34 P. (2d) 351, claims which may be presented in a receivership are classified, (a) those which at the time of the commencement of the proceeding furnish a present cause of action; (b) those which at the commencement of the proceeding are certain, but are not matured and are unliquidated; and (c) those which are contingent. It is also stated in that case that a contingent claim is one where no liability yet exists, but which is dependent upon the occurrence of some event which creates the liability, and an unliquidated claim is one which possesses the element of present liability, although the amount of

payment is uncertain. It is there held that contingent claims are not provable in a receivership, and that,

"If a party does not occupy the status of a creditor, having either a matured, or else an unliquidated, claim, during the period for filing claims, his claim can not be approved, even though a subsequent event should vitalize and ripen it."

The law being definitely settled in that case as to the non-provability of contingent claims, there is no occasion to consider authorities from other jurisdictions. It is said, however, that that case can be distinguished from the one which is now before us; but, so far as the law is concerned, there is no distinction, because the opinion states the principles clearly and concisely. It is true that the facts which showed the contingency in that case are different from the facts which show the contingency in the present case, but that does not militate against the law, as stated in the opinion. The claim, being contingent when the time for filing claims expired, was not provable.

With reference to the powers of a court of equity to extend the time for the presentation of claims in a receivership pending before it, it must not be overlooked that we are not considering a receivership created by order of the court. It is not necessary here to determine what the powers of the court may be in such a case. In this case, the American Bank was taken over by the state supervisor of banking on account of its financial condition, in pursuance of the statute which authorized him to do so, that is, the state banking law.

Rem. Rev. Stat., § 3270 [P. C. § 313], which is one of the sections of the state banking law, requires that proof of claim may be made "not later than ninety days from the date of the first publication" of notice, and further provides that:

"After the expiration of the time fixed in the notice the supervisor of banking shall have no power to accept any claim except the claim of a depositor, and all claims except the claims of depositors shall be barred."

Here, the statute prescribes the time, and the court is without any discretion in the matter and must follow the requirements thereof. *Albright v. Sunset Motors,* 148 Wash. 348, 268 Pac. 1036; *Fotheringham v. Spokane Sav. Bank,* 175 Wash. 169, 27 P. (2d) 139; *Filene's Sons Co. v. Weed,* 245 U. S. 597, 62 L. Ed. 497, 38 S. Ct. 211.

The case of *In re Cashmere State Bank,* 169 Wash. 258, 13 P. (2d) 892, as I read it, does not hold that a court of equity has the right to disregard the requirements of a statute of limitations passed by the legislature.

For the reasons stated, I am not in accord with the majority opinion; and I therefore dissent.

SIMPSON and MILLARD, JJ., concur with MAIN, J.